**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LONDON DIVISION**

IN RE

HUNTER BLANE MARTIN                                    CASE NO. 18-60270
MARIA LELITA JAYME-MARTIN                                      CHAPTER 7

DEBTORS

**MEMORANDUM OPINION AND ORDER**
**DENYING MOTION TO DISMISS CASE**

Husband Debtor's best friend, a lawyer, prepared an agreed judgment awarding the

lawyer's wife a $241,250 judgment almost a decade ago purportedly based on Debtors' purchase

of her business.  Eight years later, the lawyer's wife (who herself is now a lawyer) executed on

the judgment, resulting in Debtors' chapter 7 filing.

This matter is before the Court on creditor Heidi Weatherly's Motion to Dismiss for

Cause and for Bad Faith [ECF No. 32 ("Motion")] and Debtors' Response [ECF No. 38].  Mrs.

Weatherly (or "Creditor") seeks dismissal of Debtors' bankruptcy case pursuant to § 707(a)[1] "for

cause," including that Debtors lacked good faith in filing this case.  The parties filed Joint

Stipulations of Fact, and the Court held an evidentiary hearing on September 26, 2018.  The

following constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R.

Bankr. P. 7052.

**<u>FINDINGS OF FACT</u>**

As suggested above, the evidence in this matter paints an odd picture of a friendship gone

awry.  Debtors were friends with Creditor and her husband, attorney Tommie Weatherly

("Attorney Weatherly"), for many years.  They were guests in each other's homes, and Debtor

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

Mr. Martin considered Attorney Weatherly his best friend, talking with him three or four times each week.

Mr. Martin testified at length about Debtors' relationship with the Weatherlys and its impact on the facts underlying Creditor's Motion and Debtors' Response.[2]  Debtors believed Attorney Weatherly was their attorney since at least May 2007, when he served as their personal counsel in the chapter 11 bankruptcy of their former company, Valley Oil Group, LLC ("Valley Oil"), in this Court.  After the Valley Oil filing, Attorney Weatherly advised Debtors to file a personal bankruptcy.  They filed a chapter 7 case in this Court in July 2008 and received their discharges in January 2009.

Though time passed, Mr. Martin testified that Attorney Weatherly never ceased his representation of Debtors.  In 2010, Attorney Weatherly approached Debtors about purchasing his wife's durable medical equipment business known as Alliance Home Care.  According to Mr. Martin, Attorney Weatherly told Debtors he thought they could "make a go" of the business using Mrs. Jayme-Martin's father's connections as a practicing physician.  [Hr'g Audio, ECF No. 63, at 6:17.]  Because Debtors believed that Attorney Weatherly was acting as their counsel and trusted him, Debtors forewent traditional due diligence measures and agreed to buy the business after Mr. Martin shadowed Mrs. Weatherly for a couple of days.

Debtors and Mrs. Weatherly did not memorialize the transaction by signing traditional sale documents, such as a bill of sale, promissory note, or security agreement.  Indeed, Mrs. Weatherly testified that she was unaware of the existence of any customary closing documents,

---

[2] In contrast, Creditor testified for a brief eleven minutes; she did not discuss the parties' social relationship and left after presenting her case-in-chief.  Attorney Weatherly did not attend the hearing.  Mrs. Weatherly did not list Attorney Weatherly as a witness on her original, timely-filed Witness List.  One day after the deadline for identifying witnesses, Mrs. Weatherly amended her original list to add Attorney Weatherly as a potential witness. Three days before the hearing, late on a Sunday evening, Mrs. Weatherly again amended her witness list to strike Attorney Weatherly.

only recalling the agreed judgment entered against Debtors in her favor in 2010 (the "Agreed

Judgment") and vaguely referencing a UCC filing that she thought existed but is not in the

record.  Both Debtors stated that the only document they signed in connection with the business

purchase was the Agreed Judgment, which Mr. Martin said they signed virtually concurrently

with acquiring the business assets.[3]  The evidence of the circumstances surrounding that

Judgment is undisputed.  Attorney Weatherly appeared in Debtors' driveway with his children in

the car and asked Debtors to sign the Agreed Judgment he drafted as collateral for the business

purchase price.  Attorney Weatherly told Mr. Martin that if he did not sign the Agreed Judgment,

his wife, Creditor Mrs. Weatherly, would leave him and take his children.  Mr. Martin testified

that Attorney Weatherly assured him that the Agreed Judgment would "never see the light of

day," and Debtors should only pay what they could when they could.   [Hr'g Audio, ECF No. 63,

at 10:40.]  With that understanding, and the belief that Attorney Weatherly was their lawyer,

Debtors signed the Agreed Judgment.

On September 17, 2010, the Laurel County, Kentucky Circuit Court entered the Agreed

Judgment, which granted Mrs. Weatherly a judgment in the amount of $241,250, plus interest

and costs, against Debtors.  It provides that Mrs. Weatherly's "right of execution shall be

suspended for only so long as" Debtors made an initial $3,000 payment and $3,000 payments

every month thereafter, with the balance due on or before October 15, 2015.  [Agreed Judgment,

ECF No. 49-1, at 1.]  It is signed by "Tommie L. Weatherly Attorney for Plaintiff" and by

Debtors, *pro se*.  [*Id.* at 2.]  Curiously, the record is devoid of any other information regarding

the Laurel Circuit Court action.

---

[3] Mrs. Weatherly testified that she did not know when the sale closed or whether the closing was near the Agreed
Judgment date, but she contended that Mr. Martin "took over the business in June of 2010."  [Hr'g Audio, ECF No.
61, at 11:01.]  The closing date does not impact the Court's decision.

Debtors operated the medical equipment business for approximately three years, even though they contend that the assets they purchased from Creditor were nearly all worthless. Mr. Martin testified that Debtors thought they were acquiring a business that generated approximately $5,000 per month, but it only produced about $500 per month. A majority of the equipment and the two vehicles that Debtors purchased had to be sold for scrap, and Debtors had to buy replacement equipment to operate. Ultimately, Debtors closed the business and liquidated its remaining assets in 2013, after a statewide competitive bidding system pushed them out of the market.

Debtors made no payments to Creditor pursuant to the Agreed Judgment, and no payment was demanded. Suddenly, in November 2017, Creditor caused the Pulaski County Sheriff to execute upon Debtors' personal property to collect the Agreed Judgment debt. The Sheriff inventoried and photographed all of Debtors' known personal property and returned his execution on February 13, 2018. When asked why she waited eight years to collect, Mrs. Weatherly testified that she did not wait, instead encouraging her counsel and husband, Attorney Weatherly, to take action. Because he did not, she acted for herself after law school. Creditor was not an attorney at the time of the 2010 sale, but she obtained her license to practice law approximately a year and a half before the hearing.

Although Debtors both testified at the meeting of creditors that they would not have consulted with a bankruptcy attorney but for Creditor's execution, and Mr. Martin stated that they "didn't really have much debt," Creditor is not the only source of Debtors' financial problems. [Transcript of § 341 Meeting, ECF No. 49-4 ("341 Tr."), at 7.] Mr. Martin generated income through a house-flipping business after the medical equipment business closed, but that ended in 2016 when his business partner had a catastrophic injury. He has been unable to

maintain employment since then despite diligent efforts, and he currently contributes to his household by caring for Debtors' children, one of whom is a minor living at home and the other is in college. When asked if there was something preventing him from being employed, Mr. Martin testified that he has applied to roughly every place in his hometown, and everyone tells him the same thing: "you're middle-aged and overly educated, and we don't want to spend the money to train you and hire you for you to find something better two or three months down the road." [Hr'g Audio, ECF No. 64, at 8:22.] He was in the second round of interviews with a potential employer at the time of the hearing, but no job offer had been extended. There is no evidence that Mr. Martin is willfully unemployed.

Mrs. Jayme-Martin's monthly income as an apprentice appraiser is not sufficient to cover the household expenses for Debtors' family, and Debtors survive largely through the generosity of their parents. Debtors receive an average of $4,166 in monthly gifts from their parents through a combination of cash and payments of expenses on Debtors' behalf, such as their cell phone, car insurance, groceries, and gas costs. Of that total, $1,000 is a regular monthly gift from Mrs. Jayme-Martin's parents, and the remainder varies.

On the advice of their counsel, Debtors did not disclose any of those gifts or expense payments as income on their Schedule I filed with their petition in this case. They also listed expenses on Schedule J that their parents sporadically pay on their behalf. Schedule J does not list excessive expenditures. Debtors have a limited food budget and no budget for their mortgage payment, real estate taxes, medical and dental expenses, or health insurance premiums. Their Schedule A/B does not list significant assets that could be sold to pay their bills. Debtors own one car for their four-person family, a 2013 Hyundai Santa Fe. Mr. Martin drives a car that belongs to Mrs. Jayme-Martin's father. They do not have equity in their home or car, and they

claimed full exemptions in all personal property except for a financed mattress, which is worth less than what they owe.

When asked to explain Debtors' lifestyle, Mr. Martin testified that Debtors live "barely" and are "extravagant by no means." [Hr'g Audio, ECF No. 63, at 1:02.] If not for the gifts they receive, he explained that they "would not be able to pay utilities [or] basic, fundamental . . . necessities of life." [*Id.* at 1:10.] He confirmed that Debtors' petition discloses all their assets. The Chapter 7 Trustee filed his Report of No Distribution & 341 Meeting Held in this case on April 30, 2018, in which he abandoned his interest in Debtors' assets and stated: "I have made a diligent inquiry into the financial affairs of the debtor(s) and the location of the property belonging to the estate; and . . . there is no property available for distribution from the estate over and above that exempted by law." [ECF No. 11.]

The parties stipulated that Debtors had gross household income of $83,000 in 2016 and $79,000 in 2017, which includes gifts, Mrs. Jayme-Martin's wages, and some income from Mr. Martin's house-flipping business in 2016 only. Debtors did not pay income taxes either year because they benefitted from a prior net operating loss carryover exceeding $1 million from Valley Oil's operations. They claimed the earned income tax credit and the child tax credit in each of the last four years, and those credits totaled $6,616 in 2017.

Even with those tax attributes and their parents' financial support, Debtors are not able to make ends meet. Debtors fell behind on their mortgage payments to The Bank of New York ("BONY"), and BONY's proof of claim indicates they are $94,178.75 in arrears on their $262,497 debt. After BONY filed a foreclosure suit against Debtors, they consulted a bankruptcy attorney. Debtors believe they have a valid foreclosure defense based on their assertion that the property description in BONY's mortgage does not cover the entire property

upon which Debtors' home sits.[4]  Mr. Martin testified that Debtors elected to delay filing

bankruptcy on their counsel's advice so that they could try to negotiate a resolution with BONY.

Mrs. Jayme-Martin agreed.

Debtors also owe a large tax debt to the Kentucky Department of Revenue ("KDR")

arising out of their ownership of Valley Oil.  Mr. Martin's mother, Marsha Smith ("Mrs.

Smith"), is jointly liable for that debt with Debtors.  To reduce its more than $100,000 debt,

KDR garnished Mrs. Smith and Mrs. Jayme-Martin's respective paychecks and Mrs. Smith and

Debtors' respective bank accounts.  Those garnishments put a significant strain on Debtors'

finances, and Mr. Martin was candid when testifying about how Debtors addressed the problem.

Debtors organized Blaze Valley Corporation ("Blaze Valley") in 1993 to operate a real

estate development business, and they later used it for their medical equipment and

house-flipping businesses.  It is currently in good standing with the Kentucky Secretary of State.

Although Debtors are unsure of the exact date, Mrs. Jayme-Martin testified that Debtors

transferred all their stock in Blaze Valley to their two minor children in 2013 or 2014 upon

Attorney Weatherly's advice.  Mr. Martin testified that ownership of the company "bounces back

and forth from time to time," but their children, currently ages 14 and 18, now own it.  [Hr'g

Audio, ECF No. 61, at 37:13.]

Blaze Valley does not presently have any assets or operations.  Instead, Mr. Martin

testified at the § 341 meeting that Blaze Valley is "basically merely a conduit through which –

where we put our money, because there's a huge tax lien out there against us and if we put

---

[4] Debtors owe a $40,000 debt to their 18-year-old daughter that is secured by a mortgage on the portion of the real estate upon which Debtors assert that BONY does not have a mortgage.  That debt is not currently due.  Mr. Martin's uncontroverted testimony was that their daughter's loan and mortgage were approved by the Pulaski County, Kentucky District Court in the probate proceeding through which Debtors' daughter inherited the money loaned.

money into our personal names, they take it." [341 Tr. at 17-18.] He explained at the evidentiary hearing that a KDR agent advised him that KDR is happy as long as it is receiving something, so perhaps he could find a company in good standing where he could "stick" money to avoid garnishment. [Hr'g Audio, ECF No. 63, at 25:31.] The parties stipulated that an average of $3,100 per month was deposited into Blaze Valley's account from September 2017 through February 2018. Despite Debtors' cash-sheltering, Mr. Martin testified that KDR's claim has been reduced to approximately $33,000 and continues to decrease due to ongoing, regular garnishments of Mrs. Jayme-Martin's paycheck.

Facing a foreclosure, garnishment, and execution of the Agreed Judgment, Debtors filed this chapter 7 bankruptcy case on March 8, 2018, about three weeks after the Pulaski County Sheriff returned his execution regarding the Agreed Judgment. At the time, Debtors were current on all debts except those owed to Creditor and BONY, and KDR was receiving wage garnishments. Debtors were negotiating with BONY.

The Court pauses to address Mr. Martin's credibility. He obtained an undergraduate degree in Public Relations and Real Estate Finance from Eastern Kentucky University in 1992. He also took online law school courses for five semesters more than five years ago. As explained below, a little knowledge can be a dangerous thing. Mr. Martin's testimony was marred with confusing, long-winded responses. In many instances, the Court views his responses as attempting to get ahead of the questions. His testimony at the § 341 meeting and the evidentiary hearing was not a model of clarity. The greatest confusion was over Mr. Martin's income.

Debtors' Schedule I lists $0.00 in income for Mr. Martin, even though it also states that he was employed by South Eastern Premier Roofing. Nearly two months after Debtors filed

their Schedule I, Mr. Martin testified at the § 341 meeting that his job at the roofing company

ended when the owner left town, and he never received a paycheck.  He then stated that his only

source of income was working for his stepfather, for whom he has been a furniture salesperson

paid in cash for about 10 years.  Debtors have never amended their Schedule I.  Three months

after the § 341 meeting, Mr. Martin filed an Affidavit in response to Creditor's Motion, in which

he states that his stepfather has not built furniture in 3 or 4 years, and when he was building, he

built fewer than 10 pieces per year.  Although Mr. Martin was paid a $1,000 finder's fee in

connection with a furniture sale at Christmas in 2013, his Affidavit states that his § 341 meeting

testimony that he had regular income as a furniture salesman was in error.  Two months after the

Affidavit was filed, Mr. Martin again clarified his prior statements when he testified at the

evidentiary hearing that he has not received a payment from his stepfather in years, but because

he is otherwise unemployed, he views that relationship as his "primary ability to create income."

[Hr'g Audio, ECF No. 61, at 1:10:28.]

Mr. Martin further muddied the waters with confusing § 341 meeting testimony about his

parents' willingness to help Debtors if they reach a resolution with BONY.  He stated that

Debtors have money set aside in case they settle with BONY that is "sitting with [his] mother"

because "in essence" Mr. Martin gave it to her.  [341 Tr. at 27.]  When asked what "in essence,"

means, Mr. Martin stated:  "I do work for my stepfather and he does not pay me everything that I

am worth to him."  [*Id.*]  The Trustee then asked:  "So in other words, they're . . . going to give

you the money . . . . ?"  [*Id.*]  Mr. Martin replied yes, then stated:  "It's like money owed, but

they just keep it.  You know, there it sits . . . ."  [*Id.* at 27-28.]  Mr. Martin then backtracked,

explaining that the money is really his stepfather's "just for love and affection," his parents are

not holding money for him, and they have only agreed to help when the time comes with BONY. [*Id.* at 28-29.]

Mr. Martin's mother's testimony added support to Mr. Martin's ultimate explanation. Mrs. Smith is a retired teacher and a music minister at her church. Her husband is a retired homebuilder who lives on Social Security benefits and builds furniture in his home. Mr. Martin often helps them. He assisted them with obtaining a reverse mortgage (they received $18,000), for which her husband gave him a $1,000 Christmas present years ago. Her hobby is taking care of her grandchildren, and she helps when she can, but her gifts are not regular or large because she does not have a lot to give. On occasion, she pays for Debtors' groceries and gas. She would try to help Debtors save their home if she could, but neither she nor her husband is holding any money for Debtors. Mrs. Smith's testimony was credible.

Both Debtors readily admitted receiving gifts from their parents when questioned at the evidentiary hearing. Although Mrs. Jayme-Martin's testimony was clear, Mr. Martin again caused confusion by delving into what he reported as income on Debtors' and Blaze Valley's respective tax returns and why he did so. Mr. Martin explained that he prepared both Debtors' personal returns and Blaze Valley's corporate returns through 2016 with the understanding that gifts had to be reported as income. He reported thousands of dollars in personal gifts on Blaze Valley's returns, so a significant portion of the entity's reported income was from those gifts instead of its own operations. Mr. Martin was not concerned with that discrepancy. He believes that reporting the income on Debtors' personal returns would not have made a difference because they would not owe tax after application of the million-dollar net operating loss carryforward.

Mr. Martin changed his gift income reporting practice beginning in the 2017 tax year. He no longer reports gifts as income on either Debtors' or Blaze Valley's returns because he says

that his counsel and his accountant, Terry Flinchum, advised him that gifts need not be reported

as income before he filed the 2017 returns.  Mrs. Jayme-Martin testified that she never discussed

gift income reporting with Debtors' accountant and did not prepare any of the tax returns that

Mr. Martin discussed, but she signed them.  She agreed that Debtors will not owe any federal

income tax until after the net operating loss carryforward is exhausted.

Creditor called Terry Flinchum, CPA as a witness to discuss Debtors' tax practices.  Mr.

Flinchum's testimony has little relevance in this matter other than confirming Mr. Martin's

confusion about his tax filings.

## <u>CONCLUSIONS OF LAW</u>

The Court has jurisdiction over this matter.  28 U.S.C. § 1334(b).  Venue is proper in this

District.  28 U.S.C. §§ 1408 and 1409.  This is a core proceeding, and the Court is authorized to

enter a final order adjudicating this matter.  28 U.S.C. § 157(b)(2)(A).

Creditor seeks dismissal of Debtors' bankruptcy case "for cause" pursuant to § 707(a),

which provides:

> (a) The court may dismiss a case under this chapter only after notice and a hearing
> and only for cause, including--
>     (1) unreasonable delay by the debtor that is prejudicial to creditors;
>     (2) nonpayment of any fees or charges required under chapter 123 of title 28;
>         and
>     (3) failure of the debtor in a voluntary case to file, within fifteen days or such
>         additional time as the court may allow after the filing of the petition
>         commencing such case, the information required by paragraph (1) of
>         section 521(a), but only on a motion by the United States trustee.

11 U.S.C. § 707(a).  The word "including" in § 707(a) "is not meant to be a limiting word," and

the examples in subsections (1) through (3) are not exclusive.  *Indus. Ins. Servs. v. Zick (In re*

*Zick)*, 931 F.2d 1124, 1126 (6th Cir. 1991) (citations omitted).  As the party seeking dismissal,

Creditor bears the burden of establishing cause.  *In re Mercury Data Systems, Inc.*, 586 B.R. 260,

269 (Bankr. E.D. Ky. 2018) (citing *Sicherman v. Cohara (In re Cohara)*, 324 B.R. 24, 27-28 (B.A.P. 6th Cir. 2005)). "The decision to dismiss is an equitable determination and within the bankruptcy court's discretion." *Id.*

In addition to seeking dismissal of Debtors' case "for cause" generally, Creditor also seeks dismissal due to Debtors' alleged lack of good faith in filing this case. Although it is not one of the examples of cause enumerated in § 707(a), "lack of good faith is a basis for dismissal under § 707(a)" in the Sixth Circuit. *Zick*, 931 F.2d at 1127. "The test for 'good faith' is fact-specific and turns on the evaluation of multiple factors, resulting in what has been termed a 'smell test.'" *Baxter v. Saramadi*, 602 F. App'x. 322, 325 (6th Cir. 2015) (quoting *Zick*, 931 F.2d at 1127-28)). The inquiry "must be undertaken on an *ad hoc* basis." *Zick* at 1129 (citation omitted). "It should be confined carefully and is generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish life-style, and intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence." *Id.*

A.      **Creditor's Request for Dismissal for Lack of Good Faith**

Creditor argues that the following supports a finding of lack of good faith and constitute cause for dismissal of this case:

- Debtors have prior experience with bankruptcy cases before this Court.

- Debtors both admitted that they signed the Agreed Judgment and did not pay according to its terms.

- Debtors both admitted that they would not have met with a bankruptcy attorney but for the issuance and service of the Pulaski County Sheriff's execution relating to the Agreed Judgment.

- Debtors both admitted that the Sheriff's execution led them to file this case.

- When they filed this case, Debtors were paying all other debts except those owed to Creditor and BONY, and they were negotiating with BONY.

- Debtors did not disclose the $4,166 in average monthly gifts they receive from their parents as income on Schedule I.

- Mr. Martin testified at the § 341 meeting that he works as a furniture salesman for his stepfather, but then testified at the evidentiary hearing that he has not received any payment from that business for approximately five years.

- Mr. Martin testified at the § 341 meeting that his stepfather did not pay him all that he was worth and that his parents were holding money for him.

- Mr. Martin's hearing testimony indicates problems with Debtors' income reporting on their tax returns and on those of Blaze Valley.  Mr. Martin testified that he prepared the returns, and Mrs. Jayme-Martin testified that she signed them.

Although Creditor's quarrel appears to be mostly with Mr. Martin, she seeks dismissal of both Debtors' cases.

Creditor makes much of Mr. Martin's inconsistent testimony, quoting various portions to support her overall contention that Debtors did not file this case in good faith.  The Court agrees that excerpts from Mr. Martin's testimony create the initial impression that something may be amiss.  But the Court cannot consider his odd statements in a vacuum, isolated from the rest of his testimony and other evidence presented.  The Court must weigh all the evidence in totality and consider the credibility of each witness when making its decision.  Although Creditor argues that Mr. Martin's contradictory explanations lack credibility and evidence a lack of good faith, it is the Court's view, having had the opportunity to observe Mr. Martin's demeanor and tone, that

he is simply incapable of giving direct answers to direct questions.  Instead, as noted above, he

tries to read too much into a simple question, resulting in nonsensical and, in some instances,

contradictory responses.  The Court attributes this behavior in large part to nervousness and a

desire to over-explain everything rather than to an intent to deceive, particularly given that Mr.

Martin's contradictory statements were often against his own interest.

Specifically, the Court does not attach substantial significance to attempts to impeach

Mr. Martin's § 341 meeting testimony.  That testimony was short and to some extent hurried,

creating an environment in which Mr. Martin's limitations could not be overcome.  Although the

Court entered an order requiring Debtors to submit to a Rule 2004 examination within 45 days of

May 1, 2018, the Court notes that Creditor did not cite testimony from any such examination, if

one occurred.  Instead, Creditor focused on Mr. Martin's limitations to create a basis for her lack

of good faith claim using his statements at the § 341 meeting.  Against this background, the

Court turns to each of the *Zick* factors.

### 1.    Concealed or Misrepresented Assets and/or Sources of Income

The first *Zick* factor is the presence of "concealed or misrepresented assets and/or sources

of income."  *Zick*, 931 F.2d at 1129.  There is no dispute that Debtors receive significant monthly

gifts from their parents that they did not disclose as income on Schedule I.  It is also undisputed

that Debtors made regular deposits into a bank account in the name of Blaze Valley, which

Debtors' children own, to avoid garnishment by KDR.  Creditor argues these facts show that

Debtors lacked good faith in filing this case.  After considering the totality of the circumstances,

the Court disagrees.

Rather than avoiding the issue or attempting to downplay the amounts they receive,

Debtors testified openly about gifts from their parents at the evidentiary hearing and admitted

that they receive an average of $4,166 per month in cash and expense payments. Debtors'

candor indicates that they are not attempting to conceal their family support. Instead, Debtors

did not list their gifts as income on the advice of their counsel. In fact, during closing argument,

Debtors' counsel contended that such gifts were not required to be disclosed on the petition.

Debtor's proposed findings of fact and conclusions of law submitted after the hearing include a

proposed finding that Debtors were not required to report their gifts as income on Schedule I

because they do not fall within Schedule I's definition of "family support payments" and are not

treated as income for tax purposes.

The Court declines to comment on the tax issue, but counsel is mistaken as to Schedule I.

In addition to listing specific "family support payments" in section 8c, Schedule I also requires

Debtors to "[s]tate all other regular contributions to the expenses that you list in *Schedule J*" in

section 11. [Official Form 106I (emphasis in original).] At a minimum, Debtors were required

to list the $1,000 per month they regularly received from Mrs. Jayme-Martin's parents. And,

depending on the regularity with which Debtors' parents paid expenses on Debtors' behalf, those

contributions may likewise have been required to be listed on Schedule I. That said, Debtors'

misplaced reliance on the advice of their counsel does not support a finding of concealment of a

source of income, particularly given that they were candid about their family support in their

hearing testimony.

Mr. Martin's confusing § 341 meeting testimony about his employment also falls under

the first *Zick* factor. Creditor contends that his testimony indicates a lack of candor. After

weighing his credibility on the issue, the Court finds that his unclear description of his role in his

stepfather's furniture business was "puffed up," perhaps due to embarrassment or his ego. No

matter what the reason, a debtor with an intent to conceal or deceive will try to hide income, not

testify to income he does not receive on a regular basis.   When asked at the § 341 meeting where

he was working, Mr. Martin stated that his only source of income is working as a furniture

salesman for his stepfather.  That is only half true.  He clarified that statement at the evidentiary

hearing by explaining that, even though he has not received a payment from his stepfather for

several years, he views that relationship as his "primary ability to create income" because he is

constantly on the lookout for a buyer, his stepfather would pay him a commission if he sold

something, and he has no other regular or irregular source of income from his labors.  [Hr'g

Audio, ECF No. 61, at 1:10:28.]  There is no dispute that Mrs. Jayme-Martin disclosed all her

employment income.

Creditor also seizes upon Mr. Martin's § 341 meeting testimony about money his parents

are allegedly holding for him.  Mr. Martin gave the impression that his parents are holding

money for him by saying:  (a) "I do work for my stepfather and he does not pay me everything I

am worth to him"; and (b) "It's like money owed, but they just keep it . . . . You know, there it

sits . . . ."  [341 Tr. at 27, 28.]  But when Creditor cites those quotes, she fails to provide his

follow-up statement:  "Well, it's really not my money.  I mean, it is his.  It's just for love and

affection."  [*Id.* at 28.]  Debtor's mother confirmed this, stating that she and her husband would

try to help Debtors with their mortgage problems if they could, but they do not owe either of

them any money.  Creditor produced no contradictory evidence.  Again, a debtor with a lack of

good faith will try to hide money, not characterize a parent's help as an asset.

Mr. Martin's § 341 meeting testimony caused additional problems when he described

Blaze Valley as "a conduit through which – where we put our money, because there's a huge tax

lien out there against us and if we put money into our personal names, they take it."  [341 Tr. at

17-18.]  But when asked if he used the corporation to hide money from KDR, he said "no."  [*Id.*

16

at 18.]  As reviewed above, Mr. Martin explained his belief that a KDR agent told him that KDR was happy as long as it was receiving some payment (which it was by garnishing Mrs. Jayme-Martin's paycheck) and suggesting that he shelter any remaining money in a corporation. Although the Court questions Mr. Martin's characterization of KDR's position, it is telling that KDR has not participated in this case.  In the context of a *Zick* good-faith analysis, Mr. Martin's statements do not suggest that he was attempting to conceal assets.  To the contrary, they show that he was very open about how Debtors protected their cash to pay household expenses, while still paying KDR through Mrs. Jayme-Martin's payroll garnishment.

Mr. Martin's incoherent explanation about how he calculated the income reported on Debtors' and Blaze Valley's respective tax returns gives the Court pause.  Mr. Martin testified that he prepared those returns through 2016 with the understanding that gifts had to be reported as income for tax purposes, and after learning that was incorrect, he stopped reporting gifts on the 2017 returns.  When questioned about a potential discrepancy in reporting Blaze Valley's income on Debtors' personal return as S corporation income, Mr. Martin could not explain why the income was not listed on their return.  Instead, he stated that it would not have made a difference if it was reported because Debtors have a net operating loss carryover from their ownership of Valley Oil, so they would not owe any taxes.  Mrs. Jayme-Martin testified that she agrees with Mr. Martin's statement that her household income is not subject to tax until the net operating loss is exhausted, and she signed the returns, but she did not prepare them.  The Court expresses no opinion about the propriety of Debtors' tax practices.  For purposes of the *Zick* analysis, however, the Court finds that this issue does not establish that Debtors are attempting to hide income or assets in this case.  Instead, they may have been open to a fault.

There is no doubt that Mr. Martin's testimony was confusing, but it does not convince the Court that he was deliberately trying to conceal or misrepresent assets or income sources in this case. When given the chance to slow down and explain his odd statements, the Court found his explanations to be adequate. Mrs. Jayme-Martin's testimony did not suffer those same problems.

### 2.   <u>Intention to Avoid a Single Debt</u>

*Zick* also requires consideration of whether Debtors intended "to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence," which would indicate lack of good faith. *Zick*, 931 F.2d at 1129. In *In re Emge*, a case cited by Creditor, the court considered, among other things, whether the debtor: "reduced his creditors to a single creditor in the months prior to filing the petition"; "filed the case in response to a judgment pending litigation, or collection action [or] there is an intent to avoid a large single debt"; and "employed a deliberate and persistent pattern of evading a single major creditor." *In re Emge*, 226 B.R. 396, 399-400 (Bankr. W.D. Ky. 1998) (citing, *inter alia*, *In re Spagnolia*, 199 B.R. 362, 365 (Bankr. W.D. Ky. 1995); *Zick*, 931 F.2d at 1124). In finding those elements satisfied, the court explained that the debtor only had one significant debt (that constituted over 60% of his total debts) and it was "clear that the debt owed to th[ose] [c]reditors was the most significant contributing factor to the [d]ebtor's bankruptcy." *Id.* at 401.

None of these factors are present here. Debtors have more than one significant debt. It is undisputed that Debtors signed the Agreed Judgment and did not pay according to its terms. Debtors were paying all debts except those owed to Creditor and BONY when they filed this case, and they were attempting to negotiate with BONY at that time. KDR was garnishing Mrs. Jayme-Martin's wages. Their Statement of Intention indicates that Debtors intend to reaffirm their mortgage debts to BONY and their daughter, as well as their secured auto and personal

property (mattress) loans.  Debtors seek to discharge their unsecured debt to Creditor.  Creditor's claim comprises less than half of Debtors' total scheduled debts, and there is no proof that Debtors employed a pattern of evading Creditor.

Creditor again focuses her argument on Debtors' § 341 meeting testimony that they would not have met with a bankruptcy attorney but for the issuance and service of the Sherriff's execution regarding the Agreed Judgment.  Debtors also answered affirmatively when Creditor's counsel asked if it was "fair to say . . . that it was the sheriff's execution, coming to your home and photographing your items of personal property, that led you to consult with a bankruptcy attorney."  [341 Tr. at 15.]  Creditor argues that Debtors' admissions show that they filed this case for the sole purpose of avoiding the Agreed Judgment debt, especially considering their knowledge of the bankruptcy system from Valley Oil's case and their prior individual case.

Creditor's focus is misplaced.  Debtors testified about their significant mortgage arrearage and ongoing KDR garnishment.  While the Sheriff's execution may have been the proverbial straw that broke the camel's back, the evidence does not establish that the Agreed Judgment debt was the only thing that drove Debtors into bankruptcy.  As reviewed above, Mr. Martin testified that Debtors met with a bankruptcy attorney before Creditor's execution to discuss BONY's foreclosure case.  He explained that Debtors chose to delay filing bankruptcy based on the advice of counsel so that they could attempt to negotiate with BONY.  Mrs. Jayme-Martin agreed that Debtors acted based on counsel's advice.

Creditor produced no evidence that Debtors exhibited conduct akin to fraud, misconduct, or gross negligence regarding the Agreed Judgment debt.  Mr. Martin's uncontroverted testimony is that he understood from Attorney Weatherly that Debtors were not required to pay the Agreed Judgment debt and the Judgment "would never see the light of day."  [Hr'g Audio,

ECF No. 63, at 10:40.]  Based on that belief, and years of no collection efforts, Mr. Martin's

understanding about the Agreed Judgment is credible.  That understanding is bolstered by his

uncontroverted evidence of the value of the assets Debtors purchased from Creditor, as well as

the lack of any further information regarding legal proceedings by Creditor against Debtors that

led to the entry of the Agreed Judgment.  There was no rebuttal testimony from Creditor on this

or any other issue.

### 3.      Excessive and Continued Expenditures / Lavish Lifestyle

The remaining *Zick* factors, excessive and continued expenditures and a lavish lifestyle,

are not present in this matter.  *Zick*, 931 F.2d at 1129.  As reviewed above, the evidence

established that Debtors live modestly on a budget that would collapse without family support.

### 4.      Creditor Did Not Meet Her Burden.

*Zick* sets a very high bar for finding that debtors lack good faith.   The Sixth Circuit

reserved that determination for only "egregious cases" involving concealed or misrepresented

assets, excessive expenses, lavish lifestyles, and intent to avoid a single debt.  Although courts

have developed a variety of factors for consideration after *Zick*, its exacting standard remains

intact.  In *Zick*, the Sixth Circuit found an "egregious case" involving a malicious breach of a

noncompetition agreement.  The Circuit Court affirmed the bankruptcy court's § 707(a)

dismissal of the debtor's case based on these findings:  "(1) the debtor's manipulations which

reduced the creditors in this case to one; (2) the debtor's failure to make significant lifestyle

adjustments or efforts to repay; (3) the fact that the petition was clearly filed in response to

[creditor's] obtaining a mediation award; and (4) the unfairness of the debtor's use of Chapter 7

under the facts of [that] case."  *Zick*, 931 F.2d at 1128, 1129.   There were also transfers or

contract assignments between the debtor and his corporation shortly before the creditor's

judgment was entered against him.  Creditor here presented no evidence analogous to those findings.

Creditor cited numerous opinions from courts across the country in support of her argument, and the Court has carefully reviewed and considered each one.  That review confirms that Creditor has failed to meet her burden.  The debtors in those cases all exhibited behavior that was significantly more egregious than Debtors' actions in this case.

For example, in *In re Spagnolia*, the debtors were married physicians with combined monthly income of $17,000 and a lifestyle that "could be described as 'extravagant' or 'lavish,' or, at the very least . . . *very comfortable* . . . ."  *In re Spagnolia*, 199 B.R. 362, 364 (Bankr. W.D. Ky. 1995) (emphasis in original).  Their monthly expenses included $200 for each of clothing, laundry and dry cleaning, and recreation, $250 for charitable contributions, $1,200 for a life insurance policy, and $1,460 for a full-time nanny and two preschools for their one child.  All expenses totaled $11,123, leaving them with nearly $6,000 of monthly disposable income.  The debtors admitted they made few, if any, lifestyle adjustments, and they conceded that they filed bankruptcy in response to a judgment entered against them and a separate pending claim, both by individuals injured by the debtors' dogs.  The court found that "[i]t would be patently unfair and unconscionable to allow these Debtors to use a Chapter 7 proceeding to discharge legitimate obligations incurred as a result of their dogs, for whose conduct they are unquestionably responsible, when they have sufficient income to repay the debts."  *Id.* at 366.  In contrast, Debtors in this case cannot cover even the most basic expenses without family support, have no disposable income, and filed bankruptcy to address multiple large debts.

Another example is *In re Mitchell*, a § 707(b)(3)(A) case in which the debtor not only failed to disclose annual income but also consistently incurred several thousand dollars of

expenses above her income level, including dining out and purchasing clothing, accessories, electronics, and beauty treatments. *In re Mitchell*, 357 B.R. 142, 155 (Bankr. C.D. Cal. 2006). She increased her average monthly spending in the four months prior to bankruptcy by more than $1,200, even after she had contacted a bankruptcy attorney. Adding to her problems, the debtor failed to disclose significant income and created a false sense of solvency by lying to at least one potential creditor to obtain credit. Although Debtors in this case had a rocky start regarding their gift income disclosure and Mr. Martin's employment, their behavior is not in the same realm of egregiousness as that of the debtor in *Mitchell*.

Other cases Creditor cited are likewise inapposite, and many focus on the debtor's lavish lifestyle and ability to repay creditors, which are not disputed issues in this case. *See, e.g., In re Davidoff*, 185 B.R. 631 (Bankr. S.D. Fla. 1995) (debtor filed bankruptcy to avoid collection action, had ability to pay debt, suffered no calamity causing bankruptcy, made no lifestyle adjustment, paid insiders, and inflated expenses by including those of non-filing spouse); *Laine v. Gregory-Laine (In re Laine)*, 383 B.R. 166 (Bankr. D. Kan. 2008) (debtor maintained expensive households in United States and Iceland even though he lived in Iceland, voluntarily supported his elderly parents, increased his prepetition payroll tax withholding to avoid garnishment by his sole creditor, and declared postpetition that he would not pay her); *In re Brown*, 88 B.R. 280 (Bankr. D. Haw. 1988) (debtor-ophthalmologist's negligence caused his patient to permanently lose vision, he did not have malpractice insurance, and he made every effort to avoid paying the patient's judgment against him, even though he would have the ability to pay by adjusting his lifestyle); *In re Piazza*, 451 B.R. 608 (Bankr. S.D. Fla. 2001) (debtor filed bankruptcy in response to judgment, intended to avoid a large single debt, was paying debts of insiders, employed a deliberate and persistent pattern of evading a single major creditor, failed to

22

make lifestyle adjustments, and had the ability to pay at least a portion of his debts); *In re Lichtenstein*, 328 B.R. 513 (Bankr. W.D. Ky. 2005) (debtor admitted that the sole purpose of the bankruptcy was to avoid a creditor's debt, attempted "numerous maneuvers" to use the bankruptcy system improperly, made no lifestyle adjustments, and shredded his financial records). Under the facts of this case, Creditor's cited legal authority does not support the relief she requests.

There is no doubt that Mr. Martin's testimony complicated this matter. Many times, he made statements that unnecessarily clouded the facts as part of a misguided attempt to explain things he anticipated might be problematic. He often made comments that were against his and Mrs. Jayme-Martin's interests. Nevertheless, his testimonial deficiencies do not establish that he or his wife lacked good faith in the filing of this case. Creditor failed to meet her burden.

**B.**    **Creditor's Request for Dismissal for "Cause" is Without Merit.**

Although Creditor argued that other cause (in addition to lack of good faith) exists to dismiss this case, Creditor did not adduce any evidence supporting "cause" for dismissal under § 707(a) beyond that discussed herein. Debtors have suffered one business misfortune after another and are now unable to pay their ordinary living expenses, much less service all their debts.

**CONCLUSION**

Based on the foregoing, IT IS HEREBY ORDERED that the Motion is DENIED.

23

---

**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



Signed By:
*Tracey N. Wise*
**Bankruptcy Judge**
**Dated: Wednesday, November 21, 2018**
**(tnw)**